# United States Court of Appeals

## For the First Circuit

No. 08-2211

MADELINE MALDONADO, individually and on behalf of her
minor children A.M.V., E.M.V., and C.M.V., ET AL.,

Plaintiffs, Appellees,

v.

SOL LUIS FONTANES, Mayor of Barceloneta, in his personal
and official capacities,

Defendant, Appellant,

MUNICIPALITY OF BARCELONETA, ET AL.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Farris[*] and Howard, Circuit Judges.

Luis F. Colon Gonzalez with whom Colon Gonzalez & Co., P.S.C.
was on brief for appellant.
Pedro R. Vázquez with whom María S. Kortright was on brief for
appellees.

June 4, 2009

---

[*]     Of the Ninth Circuit, sitting by designation.

**LYNCH**, **Chief Judge**.  Residents of three public housing complexes brought a civil rights suit under 42 U.S.C. § 1983 against the Mayor of Barceloneta, Puerto Rico, protesting the precipitous seizures and cruel killings of their pet cats and dogs. The twenty named plaintiff families assert violations of their Fourth Amendment rights to be free from unreasonable seizures of their "effects" and their Fourteenth Amendment procedural and substantive due process rights.

The pets were taken in two successive raids, within ten days of the Municipality of Barceloneta assuming control of the public housing complexes from the Puerto Rico Public Housing Administration ("PRPHA") on October 1, 2007.  Plaintiffs allege that before that transfer, they had been permitted to have their pets.  Only a few days before the raids, the residents were told to surrender their pets on pain of being evicted from their homes. They allege that after many of the pets were seized, the pets were killed by slamming them into the sides of vans and by hurling the survivors off a 50-foot-high bridge.  Some plaintiffs eventually found their family pets dead under the bridge.

The Mayor, in his personal capacity, moved to dismiss all damages claims against him on grounds of qualified immunity.  That motion was denied; the Mayor has taken an interlocutory appeal. This court denied the Mayor's motion to stay proceedings in the

district court.  We are informed that discovery is being completed and that the case is nearly ready for trial.

We affirm the denial of the Mayor's motion for qualified immunity on the Fourth Amendment and Fourteenth Amendment procedural due process claims.  Applying the Supreme Court's new decision in Ashcroft v. Iqbal, No. 07-1015, ___ S. Ct. ___, 2009 WL 1361536 (May 18, 2009), we reverse the denial of qualified immunity to the Mayor as to the plaintiffs' Fourteenth Amendment substantive due process claims and order those claims dismissed.  We also revise our prior circuit law on the steps to follow in the qualified immunity analysis in light of superceding Supreme Court precedent.

## I.

On interlocutory appeal from the denial of qualified immunity through a motion to dismiss, "we must take all the factual allegations in the complaint as true."  Iqbal, 2009 WL 1361536, at *13.  Yet we need not accept as true legal conclusions from the complaint or "'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. at *12 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

The Municipality assumed operational control over three public housing complexes in Barceloneta from the PRPHA on October 1, 2007.  Between October 3 and 7, 2007, the Municipality delivered notices to residents of those complexes that it would be enforcing

a pet policy, which prohibited the residents from having cats or dogs. The notices threatened eviction for those who did not surrender their pets and included an English-language copy of the pet policy, but not a Spanish-language version. The residents of those complexes are predominantly Spanish speakers. Plaintiffs allege that few speak, read, or write English. Before the Municipality took control of the housing complexes, residents had kept pets with the knowledge and consent of the housing complexes' administrators, and there was no enforced prohibition on the ownership of a cat or dog.

On October 8, 2007, without any further notice to the residents, uniformed municipal employees and workers from Animal Control Solutions, Inc. ("ACS"), a private contractor hired by the Municipality, arrived at the three public housing complexes and violently captured numerous pet cats and dogs. They went door-to-door and demanded that the residents give up their pets or face eviction. Many people complied. Some residents who were not home at the time had their pets taken from inside their enclosed patios and laundry areas. Municipal employees and ACS workers also captured several pets that were in the common areas of the housing project, even taking pets away from children. The Mayor and other high ranking municipal officials were present that day at least at one of the housing complexes while the animals were seized.

Once the pets were captured, municipal employees and ACS workers injected some of the animals with an unknown substance. They also slammed the animals against the side of a van, causing some witnesses to believe that their pets had been killed in their presence. Those animals surviving the initial trauma were then thrown to their deaths off a 50-foot-high bridge, known as El Paseo de Indio ("The Indian Walk"). Some residents eventually found their pets dead underneath the bridge.

Similar raids occurred two days later at each of the three housing complexes, also resulting in the cruel killings of the residents' animals. There is no claim that the defendant Mayor was present at these raids. The residents protested. On October 17, 2007, the Municipality resigned its position as the administrator of the public housing complexes in Barceloneta.

On October 19, 2007, the residents sued the Mayor and other municipal officials under 42 U.S.C. § 1983, claiming violations of their rights under the Fourth and Fourteenth Amendments, as well as under other federal and state laws that are not involved in this appeal. The complaint sought, inter alia, punitive damages and compensatory damages of at least $1500 for the value of each pet and $500,000 for the harm inflicted on each plaintiff, as well as injunctive and declaratory relief.

On April 29, 2008, the Mayor moved to dismiss all the damage claims against him, asserting qualified immunity. On July

29, 2008, the district court issued an opinion and order denying the Mayor qualified immunity on the plaintiffs' Fourth and Fourteenth Amendment claims.[1]  This interlocutory appeal from the district court's denial of qualified immunity followed.

## II.

A.          Appellate Jurisdiction over Denials of Qualified Immunity

An order rejecting a public official's qualified immunity defense is immediately appealable as a "final" judgment within the meaning of 28 U.S.C. § 1291 to the extent that it turns on an issue of law.  Iqbal, 2009 WL 1361536, at *8 ("[T]his court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291."); Behrens v. Pelletier, 516 U.S. 299, 306-07 (1996); Bergeron v. Cabral, 560 F.3d 1, 5 (1st Cir. 2009).  That is, "when the district court assumes a set of facts favorable to the plaintiff and decides as a matter of law that those facts do not form a satisfactory basis for a finding of qualified immunity, an interlocutory appeal is available under the collateral order doctrine."  Bergeron, 560 F.3d at 6.

Here, we have jurisdiction to consider the Mayor's legal argument that the plaintiffs have not stated cognizable

---

[1]    The Mayor also moved to dismiss for failure to state a claim, which the district court granted as to a few claims, but denied as to the Fourth and Fourteenth Amendment claims and pendent state law claims.  That order was not appealable and is not before us.

constitutional violations, accepting the facts alleged in the complaint as true. We also have jurisdiction to decide whether the constitutional rights that the Mayor allegedly violated were clearly established at the time. But we do not at this stage in the litigation have jurisdiction to decide whether any constitutional violations actually occurred or to resolve any factual disputes necessary to make that determination.

Assessing qualified immunity at the motion to dismiss stage requires that we evaluate the sufficiency of the plaintiffs' pleadings. Indeed, because "whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded," Iqbal, 2009 WL 1361536, at *9, we must scrutinize the plaintiffs' complaint to determine whether it states a plausible entitlement to relief.

Two underlying principles guide our assessment of the adequacy of the plaintiffs' pleadings. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at *13 (citing Twombly, 550 U.S. at 555). Such conclusory statements are "not entitled to the assumption of truth." Id.

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. (citing Twombly, 550

U.S. at 556). This second principle recognizes that the court's assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" Id. (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

B.        The Qualified Immunity Doctrine

The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). For this reason, immunity is to be resolved at the earliest possible stage in litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991). In some cases, the doctrine ensures that insubstantial claims against government officials will be resolved before discovery. Anderson v. Creighton, 483 U.S. 635, 640, n.2 (1987). Indeed, "[t]he basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'" Iqbal, 2009 WL 1361536, at *16 (quoting Siegert v. Gilley, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in judgment)).

1.    <u>Qualified Immunity: A Two-Step Analysis</u>

The Supreme Court's most recent rulings on qualified immunity provide clarification on several points and require some revision of the nomenclature and steps this circuit has previously used.

In <u>Pearson</u> v. <u>Callahan</u>, 129 S. Ct. 808 (2009), the Court reiterated that the qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. <u>Id.</u> at 815-16. The Supreme Court has often described the analysis as a two-step test. <u>See, e.g.</u>, <u>id.</u> at 815; <u>Scott</u> v. <u>Harris</u>, 550 U.S. 372, 377 (2007); <u>Brosseau</u> v. <u>Haugen</u>, 543 U.S. 194, 195 (2004) (per curiam); <u>Chavez</u> v. <u>Martinez</u>, 538 U.S. 760, 766 (2003); <u>Saucier</u> v. <u>Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled in part by</u> <u>Pearson</u>, 129 S. Ct. 808.

It is clear from the Supreme Court's description of the second, "clearly established" step of the qualified immunity analysis that the second step, in turn, has two aspects. One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 640. The other aspect

-9-

focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Indeed, "[i]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Brosseau, 543 U.S. at 198 (quoting Saucier, 533 U.S. at 201). Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 199 (quoting Saucier, 533 U.S. at 202) (internal quotation marks omitted). That is, the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional. See Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In administering the Court's test, this circuit has tended to list separately the two sub-parts of the "clearly established" prong along with the first prong and, as a result, has articulated the qualified immunity test as a three-part test. See, e.g., Bergeron, 560 F.3d at 7 & n.2; Estate of Bennett v. Wainwright, 548 F.3d 155, 167 (1st Cir. 2008); Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008); Philip v. Cronin, 537 F.3d 26, 34

-10-

(1st Cir. 2008).  While the substance of our three-part test has been faithful to the substance of the Court's two-part test, we owe fidelity to the Court's articulation of the test as well.  And so we now adopt the Court's two-part test and abandon our previous usage of a three-step analysis.

This we can do without invoking an en banc court given the intervention of the Supreme Court's decision in Pearson.  See Wallace v. Reno, 194 F.3d 279, 283 (1st Cir. 1999) ("When a panel of this circuit has decided an issue, another panel will ordinarily not revisit that issue; but, of course, this limitation does not apply where an intervening decision of the Supreme Court overturns or undermines our earlier decision.").

2.    It is Permissible to Avoid the First Step of the Qualified Immunity Analysis

Pearson also held that while it is frequently appropriate for courts to answer each step in turn, it is not mandatory that courts follow the two-step analysis sequentially.  Courts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right.

As Pearson explained, the primary motivation behind Saucier's sequential two-step rule was to promote the development of constitutional precedent.  129 S. Ct. at 816.  Of course, there may be instances where "a discussion of why the relevant facts do not violate clearly established law . . . make[s] it apparent that

-11-

in fact the relevant facts do not make out a constitutional violation at all," id. at 818, making it worthwhile to address the first prong of the qualified immunity analysis.

But in some cases, discussion of the first prong of the qualified immunity analysis will result "in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." Id. This expenditure of resources by the courts and the parties is difficult to justify in cases where the constitutional questions presented are heavily fact-bound, minimizing their precedential value. Id. at 819.

Further, the utility of bypassing the first prong is particularly apparent "[w]hen qualified immunity is asserted at the pleading stage [because] the precise factual basis for the plaintiff's claim or claims may be hard to identify." Id. Indeed, as this circuit has held, and Pearson recognized, where the answer to the first prong of the immunity question may depend on the further development of the facts, it may be wise to avoid the first step. See id. (citing Buchanan v. Maine, 469 F.3d 158, 168 (1st Cir. 2006)). The Mayor here has chosen not to wait, but to press the Fourth Amendment and Fourteenth Amendment issues at the pleadings stage, and then to appeal, in part, the denial of qualified immunity on the pleadings.

III.

A.      Application of Qualified Immunity Analysis to the Fourth Amendment Claim

The Mayor argues that the complaint fails to state a cognizable constitutional claim under the Fourth Amendment because that Amendment does not provide protection to individuals in their ownership of household pets under these circumstances.  The first part of the Mayor's argument is essentially that taking plaintiffs' assertions in the complaint as true, the complaint still fails to state a Fourth Amendment claim.

An individual's interest in his pet cat or dog does fall within the Fourth Amendment's prohibition of unreasonable seizures, though we have not addressed the question before.  As the Fourth Circuit's decision in Altman v. City of High Point, 330 F.3d 194 (4th Cir. 2003), establishes, privately owned pet dogs do qualify as property, such that pets are "effects" under the seizure clause of the Fourth Amendment.[2]  Id. at 202-04.  We rely on and do not repeat Judge Luttig's scholarly analysis that dogs are "effects" for purposes of being secure from unreasonable seizure under the Fourth Amendment.

_____

[2]     The Fourth Amendment provides, in relevant part: "The right of the people  to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The Fourth Amendment's prohibition on unreasonable searches and seizures applies to Puerto Rico and to the states through the Fourteenth Amendment.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961); Martínez-Rivera v. Sánchez Ramos, 498 F.3d 3, 7 n.4 (1st Cir. 2007).

-13-

The killing of a person's pet dog or cat by the government without the person's consent is also a seizure within the meaning of the Fourth Amendment. Three other circuits had announced this conclusion well before the violations alleged here. See Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2001); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994), overruled on other grounds by Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002); Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir. 1994). Since then, the Seventh Circuit has also held that the killing of a companion dog is a Fourth Amendment seizure. See Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008). No circuit court has held otherwise.

We reject the Mayor's argument that this law was not clearly established because this court had not earlier addressed the questions of effects and seizure. Against the widespread acceptance of these points in the federal circuit courts, the Mayor's argument fails. These are principles of law, and the law was sufficiently recognized by courts to be clearly established. See Wilson v. Layne, 526 U.S. 603, 617 (1999) (holding that a constitutional right is clearly established if "a consensus of persuasive authority" exists "such that a reasonable officer could not have believed that his actions were lawful"); Bergeron, 560 F.3d at 11-12.

-14-

The Mayor's underlying argument as to the Fourth Amendment qualified immunity issue is that, as a matter of law, a court should now hold that a reasonable official in the Mayor's position would not have thought he was violating the plaintiffs' Fourth Amendment rights, under the second aspect of the "clearly established" second prong. He reasons that there is a diminished expectation of privacy in pet ownership, and that diminished interest routinely must give way to public safety and health concerns. The Mayor argues that the plaintiffs' privacy interest in their pets was particularly diminished here because the residents had "voluntarily subscribed" to the pet policy through their lease agreements. Given the state's interest in collecting stray animals, the plaintiffs' "voluntary" subscription to the pet policy, and the Municipality's decision to collect strays and accept non-conforming pets only with advance notice, the Mayor argues that he could reasonably believe that his actions did not violate the Fourth Amendment.

The Mayor's version of what happened is, however, inconsistent with the factual allegations of the complaint, which we must take as true. Starting with the pet policy, the inferences from the complaint are that the terms of the pet policy were not part of plaintiffs' leases, and were imposed after the fact and without the residents' consent. A reasonable inference from the complaint is that the pet policy was new to the residents of these

-15-

three public housing complexes and was unilaterally imposed by the Mayor on October 1. These are material disputes of fact as to when the pet policy was first applied to plaintiffs and the circumstances under which it was applied. The Mayor says these disputes are immaterial by pointing to 42 U.S.C. § 1437z-3, a public health and welfare law covering pet ownership in public housing complexes. But that statute works against the Mayor for it authorizes public housing residents to own common household pets "subject to the reasonable requirements of the public housing agency." Id. § 1437z-3(a).[3]

The residents also complain about the manner in which they were notified of the policy, and their lack of an opportunity to object. The residents are predominantly Spanish speaking; yet the Municipality provided the pet policy to them only in English. The notice on its face did not provide any opportunity to object to the policy. Nor did the notice say when the policy would be enforced. And the short length of time between the residents' receipt of the notice and the policy's enforcement, the plaintiffs allege, provided them with insufficient opportunity to find humane solutions for any pets which they had to relinquish.

---

[3]    It is unclear whether the residents also deny that the pet policy is a reasonable requirement or that there have been problems such as to justify the regulations. If so, this presents material issues of disputed fact.

-16-

We cannot say on the basis of the pleadings alone that an objective official in the Mayor's position, as a matter of law, would have reasonably concluded his actions in implementing and executing the pet policy were not a violation of the Fourth Amendment. The district court was correct to deny the Mayor qualified immunity on the Fourth Amendment claims based on the pleadings.

B.    Application of Qualified Immunity Analysis to the Fourteenth Amendment Due Process Claims

The Mayor has waived any appeal from the denial of qualified immunity as to the Fourteenth Amendment procedural due process claims by failing to brief it.[4]

The plaintiffs have also alleged Fourteenth Amendment substantive due process violations, and the Mayor does appeal from the denial of qualified immunity as to those claims. Fourteenth Amendment substantive due process claims often turn on whether the alleged misconduct "shocks the conscience." See Espinoza v. Sabol, 558 F.3d 83, 87 (1st Cir. 2009) ("The substantive component of the Due Process Clause is violated by executive action 'when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998))).

---

[4]    This does not mean he is barred from raising qualified immunity as to the procedural due process claims again on a more developed record before or at trial.

The Mayor's primary argument that he is entitled to immunity is that a "shock the conscience" violation against him or other municipal officials is not stated on the face of the complaint because such a claim cannot arise as to the treatment of animals. He makes a cursory argument that such a claim may be stated only as to the treatment of people and that the treatment of animals must be left to state law. But the language of the Fourteenth Amendment is that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment protects against certain deprivations of people's property, and "property" encompasses people's pet cats and dogs.

The Mayor's argument continues that the substantive due process "shock the conscience" caselaw does not apply in situations of deprivation of property, but only to deprivations of the life and/or liberty of a person. This argument, we think, ignores the language of the Amendment. It is the <u>effect</u> on the person from the deprivation of the interest in life, liberty, or property which may be "shocking to the conscience," and perhaps beyond the constitutional pale. We see no reason to read the word "property" out of the Amendment; we would be reluctant to conclude that deprivations of property cannot ever be so shocking in their effect on the person as to lead to a Fourteenth Amendment substantive due process violation. Cf. <u>Clark</u> v. <u>Boscher</u>, 514 F.3d 107, 112-13 (1st

-18-

Cir. 2008) (considering an alleged substantive due process violation involving the deprivation of property but recognizing that "the substantive due process doctrine may not, in the ordinary course, be invoked to challenge" the type of misconduct alleged (quoting Mongeau v. City of Marlborough, 492 F.3d 14, 17 (1st Cir. 2007))).

Yet it is also true that the Supreme Court has been firm in its reluctance to expand the doctrine of substantive due process. See Chavez, 538 U.S. at 775. Indeed, it is because of this resistance toward expanding the reach of substantive due process that the official conduct "most likely to rise to the conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." Id. (quoting Lewis, 523 U.S. at 849) (internal quotation marks omitted). While there is reason for skepticism about the plaintiffs' theory, we are reluctant to resolve at this point the question of whether the government had an interest sufficient to justify the cruel killing of household pets arbitrarily seized from their owners, even if the government ultimately had a legitimate interest in restricting ownership of pet cats and dogs in public housing. We do not need to render what would essentially be an advisory opinion on these precise arguments by the Mayor that a substantive due process claim may never be stated as to the arbitrary and cruel seizure and killing of pets. See Pearson, 129 S. Ct. at 818.

-19-

Instead, we resolve the qualified immunity issue in the Mayor's favor under Pearson's first prong for different reasons. That is, analyzing the pleadings under Iqbal, we hold that the allegations of the complaint do not allege a sufficient connection between the Mayor and the alleged conscience-shocking behavior -- the killing of the seized pets -- to state the elements of a substantive due process violation.[5]

The purported liability of the Mayor for damages for substantive due process violations does not involve a policy of the Municipality for which he is responsible, nor does it rest on his personal conduct. Instead, the allegations against the Mayor are that he promulgated a pet policy for the public housing complexes and was present at and participated in one of the raids. This level of involvement is insufficient to support a finding of liability.

First, there is nothing conscience-shocking about the pet policy itself. The terms of the pet policy, for which the complaint holds the Mayor responsible, say nothing about how "Prohibited Pets," which include cats and dogs, are to be removed

---

[5] The district court, in denying qualified immunity on the substantive due process claim, did not analyze the specific facts alleged against the Mayor, but incorrectly focused instead on the acts of the "government officials." We also note that the district court opinion uses language which could be misread to conclude that the court found the defendants had in fact violated constitutional rights. That issue was not before the court, and it could make no such findings at this stage in the litigation.

from their owners or what happens thereafter to the pets. Plaintiffs complaint identifies no policy which authorized the killing of the pets, much less one which the Mayor authorized.[6]

Second, the complaint does not allege that the Mayor was personally involved in any conscience-shocking conduct during the raids. The complaint does allege that the Mayor was present during the first raid on October 8, 2007 and that he observed it. But he is not named as the individual who directly planned, supervised, and executed the raids of their aftermath; the complaint merely alleges that he supervised, directly or indirectly, the agencies involved. And there is no allegation the Mayor participated in the killing of any pet or directed the services of the private contractor.

There is a generalized allegation that the Mayor planned, personally participated in, and executed the raids in concert with others, but the others are named as the persons with specific administrative responsibilities as to the public housing complexes.

---

[6]    The complaint alleges that an informal policy emerged from the repeating of the raids. But a single repetition of the raids alone is insufficient to establish endorsement of an informal policy by the Mayor. See Estate of Bennett, 548 F.3d at 177 (recognizing that to impose liability on the policymaking official under § 1983, a policy "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice" (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989))). We reject such "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 2009 WL 1361536, at *12 (alteration in original) (quoting Twombly, 550 U.S. at 557).

"These bare assertions, much like the pleading of conspiracy in Twombly, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional [tort]," Iqbal, 2009 WL 1361536, at *14 (quoting Twombly, 550 U.S. at 555), and are insufficient to push the plaintiffs' claim beyond the pleadings stage. Moreover, the complaint alleges, without any more details, that the Mayor was among all the other public and private employees "snatching pets from owners." Although these bare allegations may be "consistent with" a finding of liability against the Mayor for seizure of the same pets, such allegations "stop[] short of the line between possibility and plausibility of 'entitlement to relief'" on the larger substantive due process claim. Iqbal, 2009 WL 1361536, at *12 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted).

A government official who himself inflicts truly outrageous, uncivilized, and intolerable harm on a person or his property may be liable; but there is no claim in this complaint the Mayor himself inflicted such harm. Cf. Vélez-Díaz v. Vega-Irizarry, 421 F.3d 71, 79 (1st Cir. 2005) (granting qualified immunity where there was no allegation that the government actors were directly involved in the offensive conduct). The allegations against the Mayor thus do not establish that his involvement was sufficiently direct to hold him liable for violations of the plaintiffs' substantive due process rights.

-22-

Nor do the allegations make out a viable case for supervisory liability, such that the Mayor could, on these pleadings, be held responsible for violations of the plaintiffs' substantive due process rights committed by subordinate municipal employees or workers from ACS.[7] See Estate of Bennett, 548 F.3d at 176-77 (explaining that supervisory liability for alleged substantive due process violations requires a showing of "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference" (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008))). Indeed, supervisory liability lies only where an "'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor" exists such that "'the supervisor's conduct led inexorably to the constitutional violation.'" Pineda, 533 F.3d at 54 (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995)).

Further, supervisory liability under a theory of deliberate indifference "will be found only if it would be manifest

---

[7] Some recent language from the Supreme Court may call into question our prior circuit law on the standard for holding a public official liable for damages under § 1983 on a theory of supervisory liability. See Iqbal, 2009 WL 1361536, at *11 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). We need not resolve this issue, however, because we find that the plaintiffs have not pled facts sufficient to make out a plausible entitlement to relief under our previous formulation of the standards for supervisory liability.

to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Id. (quoting Hegarty, 53 F.3d at 1380) (internal quotation marks omitted). Here, the Mayor's promulgation of a pet policy that was silent as to the manner in which the pets were to be collected and disposed of, coupled with his mere presence at one of the raids, is insufficient to create the affirmative link necessary for a finding of supervisory liability, even under a theory of deliberate indifference. The Mayor is entitled to qualified immunity on the pleadings on the Fourteenth Amendment substantive due process claims.

We note that the Mayor has denied many of the factual allegations asserted in the complaint. Nothing in this opinion precludes the Mayor from seeking qualified immunity on a further developed record at a later stage.

IV.

The district court's order denying the Mayor qualified immunity as to the plaintiffs' Fourth Amendment and Fourteenth Amendment procedural due process claims is affirmed. The district court's order denying the Mayor qualified immunity as to the plaintiffs' Fourteenth Amendment substantive due process claims is reversed, and the plaintiffs' Fourteenth Amendment substantive due process claims are dismissed. Each party shall bear its own costs.