# United States Court of Appeals
## For the First Circuit

No. 10-1619

GERMAN A. SOTO-TORRES,

Plaintiff, Appellee,

v.

LUIS FRATICELLI, Special Agent in Charge,

Defendant, Appellant,

ROBERT MUELLER, Director of the Federal Bureau of Investigation;
CONJUGAL PARTNERSHIP MUELLER-DOE; CONJUGAL PARTNERSHIP
FRATICELLI-DOE; TEN UNKNOWN AGENTS OF THE
FEDERAL BUREAU OF INVESTIGATION,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

H. Thomas Byron III, Appellate Staff, Civil Division, with
whom Tony West, Assistant Attorney General, Rose E. Rodriguez-
Velez, United States Attorney, and Barbara L. Herwig, Appellate
Staff, Civil Division, were on brief, for appellant.
Francisco M. López-Romo, with whom Edgar R. Vega-Pabón was
on brief, for appellee.

August 19, 2011

**LYNCH**, **Chief Judge**.  The question before us is whether the Special Agent in Charge (SAC) of the FBI's Puerto Rico operations, Luis Fraticelli, who is sued in his individual capacity, is entitled to qualified immunity on the grounds that German A. Soto-Torres's second amended complaint failed to meet the requirements of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  Soto-Torres brought suit asserting claims of unlawful detention and excessive force under a Bivens theory.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

Soto-Torres complains of actions during the September 23, 2005, execution of a search warrant by FBI or other federal agents on the residence of Filiberto Ojeda Rios, a notorious fugitive and convicted felon who was thought to be dangerous and hiding in a house in Hormigueros, Puerto Rico.  That house was near the property of Soto-Torres's parents.  The complaint alleges that, in the course of these operations, unnamed FBI agents assaulted Soto-Torres, pushed him to the ground and handcuffed him, and detained him in handcuffs for approximately four hours without explaining the basis of his detention.  Although SAC Fraticelli was in charge of the operation, he was not present during the operation and had no personal contact with Soto-Torres.

The complaint originally named as defendants Fraticelli and ten unknown FBI agents, in their official and individual capacities, as well as FBI Director Mueller in his official

-2-

capacity. Only the Bivens claim against Fraticelli remains[1] and is before us. The complaint was filed about one year after the event; Soto-Torres filed his first amended complaint about two years later. His second amended complaint was filed in October 2009, after the decision in Iqbal.

Defendants originally moved for summary judgment on grounds of qualified immunity, which the district court denied. The Supreme Court then decided Iqbal, after which defendants filed a Rule 12(c) motion requesting judgment on the pleadings on Soto-Torres's personal capacity claims against Fraticelli; defendants also moved to dismiss the official capacity claims against Mueller, Fraticelli, and the unnamed agents pursuant to Rule 12(b)(1) on grounds of sovereign immunity. The district court allowed Soto-Torres to amend his complaint in light of Iqbal and denied defendants' 12(b)(1) motion without prejudice so that it could be re-filed after the complaint was amended. After Soto-Torres filed his second amended complaint, defendants renewed their motion. The district court granted the motion to dismiss the official capacity claims against Mueller, Fraticelli, and the unnamed agents, but it denied the motion as to the personal capacity claims, including those against Fraticelli. Fraticelli filed this interlocutory appeal from that denial.

---

[1]     The plaintiff has never identified the John Doe unnamed FBI agent defendants.

-3-

We hold that plaintiff's pleadings are insufficient under Iqbal, reverse, and direct entry of judgment for Fraticelli.

I.

In an interlocutory appeal from the denial of qualified immunity on a motion to dismiss on the pleadings, we accept the well-pleaded facts of the plaintiff's claim as alleged in the complaint. Iqbal, 129 S. Ct. at 1950. We do not accept the complaint's legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" Id. at 1949 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)); see also Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009).

We provide some undisputed background facts, agreed upon by the parties. Soto-Torres's claims arise out of an FBI operation to apprehend Filiberto Ojeda Rios, a Puerto Rico fugitive and leader of the Macheteros group. The Macheteros have claimed responsibility for acts of violence in Puerto Rico, including the murders of a police officer in 1978 and U.S. Navy sailors in 1979 and 1982. In 1983, Macheteros operatives robbed a Wells Fargo facility in West Hartford, Connecticut. Two years later, when FBI agents acted to arrest Ojeda and other Macheteros members in connection with the robbery, Ojeda shot and wounded an agent. He was acquitted of the shooting charge in a 1989 trial in which he represented himself.

-4-

In 1990, while released on bond pending his trial for the armed robbery charges, Ojeda severed his electronic monitoring device and fled; the next day the U.S. District Court for the District of Connecticut issued a warrant for his arrest. In 1992, Ojeda was tried in absentia for the armed robbery, convicted on fourteen counts, and sentenced to fifty-five years in prison.

In early September 2005, the San Juan FBI determined that Ojeda was living in a house in Hormigueros on the west side of Puerto Rico. At this time there were warrants for Ojeda's arrest both for his 1990 flight and for his 1992 conviction. Consistent with the hazards of the operation, on September 22, 2005, "a team of FBI sniper-observers initiated surveillance of the Ojeda residence." Their surveillance "continue[d] until September 23, 2005."

The parents of Soto-Torres lived within "hundreds of feet" of this Ojeda target residence. The two properties did not adjoin, and from Soto-Torres's parents' home "there was no visibility toward the targeted residence" due to "the topography of the place." No warrant was requested to search Soto-Torres's parents' property. During the period of the FBI surveillance, Soto-Torres went to his parents' property "on a daily basis" to feed his horse.

On September 23, 2005, at approximately 3:45 p.m., Soto-Torres arrived at his parents' property to feed his horse and work

on fences on the property.  At some point between 4:10 p.m. and 4:15 p.m., two unidentified helicopters flew overhead and "several vehicles . . . full of armed federal agents" arrived at the property.

Soto-Torres alleges that these agents "assaulted and pushed [him] to the floor" and that he was subsequently "detained and handcuffed behind his back for almost four hours" while being "strongly interrogated by several federal agents."[2]  He alleges that the agents "pointed their firearms" toward him for "most of" this time and threatened to put him in prison.  He alleges that he was not told what was happening until his eventual release at around 8:00 p.m., "having be[en] placed under the most severe mental distress for almost four (4) hours."  As injury, he alleges that this detention and treatment caused him "physical harm and emotional suffering," such that he "required psychological and medical treatment."[3]

---

[2]  The complaint's allegations that Soto-Torres was "illegally and unreasonabl[y] detained" and that "excessive force" was used in pushing him to the floor are legal conclusions that are not to be credited.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

[3]  He also claims that there were several residences closer to the targeted residence in which no one was detained or handcuffed.

Soto-Torres does not allege that SAC[4] Fraticelli was present when these events occurred or that Fraticelli witnessed their occurrence. Rather, he makes only two relevant allegations. He alleges that Fraticelli "was the officer in charge during the incident" and that he "participated in or directed the constitutional violations alleged . . . or knew of the violation[s] and failed to act to prevent them." These are the only allegations that address Fraticelli's involvement in Soto-Torres's detention.[5]

---

[4]    Each of the FBI's fifty-six field offices, also called divisions, across the United States and in Puerto Rico is overseen by a Special Agent in Charge (SAC), except for the field offices in Los Angeles, New York City, and Washington, D.C., which are headed by Assistant Directors in Charge due to those offices' large size. See Local FBI Offices, http://www.fbi.gov/contact-us/field (last visited Aug. 12, 2011).

[5]    Soto-Torres's complaint also alleges that his detention would have been prevented if the FBI had taken the time to "investigate and to determine who [he] was" prior to executing the warrant, and that "Fraticelli incurred [sic] in deficient decisions reflecting inadequate assessment of the known circumstances leading to the detention." The complaint states that the FBI began surveillance on September 19 "following and receiving direct orders from defendant Fraticelli," that Soto-Torres went to his "parent's property on a daily basis . . . in the same vehicle which was registered under his name and address," and consequently that the FBI agents would have been "able to get the vehicle's license plates to determine who [he] was and to investigate all they need[ed] to know about the property owners in the property registry."
All of these allegations are beside the point because the complaint does not allege that this purported omission was itself unconstitutional, nor would the law support such a claim. See Daniels v. Williams, 474 U.S. 327, 333 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the United States Constitution."); Billington v. Smith, 292 F.3d 1177, 1190 (9th Cir. 2002) ("The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional

-7-

II.

The district court's denial of Fraticelli's qualified immunity defense is immediately appealable as a final decision within the meaning of 28 U.S.C. § 1291. See Iqbal, 129 S. Ct. at 1947. We review de novo the court's denial of Fraticelli's motion for judgment on the pleadings. See Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).

A.      Bivens, Qualified Immunity, and the Pleading Requirements

Bivens establishes, as a general proposition, "that victims of a constitutional violation perpetrated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits." Ruiz Rivera v. Riley, 209 F.3d 24, 26 (1st Cir. 2000) (quoting Wright v. Park, 5 F.3d 586, 589 n.4 (1st Cir. 1993)) (internal quotation mark omitted). This implied cause of action is the federal analog to § 1983 suits against state officials. Iqbal, 129 S. Ct. at 1948. "The purpose of Bivens is to deter individual federal officers from committing constitutional violations." Chiang v. Skeirik, 582 F.3d 238, 243 (1st Cir. 2009) (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001)) (internal quotation marks omitted).

A government officer is entitled to qualified immunity from Bivens liability on a Rule 12(c) motion unless (1) "the facts that a plaintiff has alleged . . . make out a violation of a

liability.").

-8-

constitutional right" and (2) "the right at issue was 'clearly established' at the time of [the official's] alleged misconduct." Pearson v. Callahan, 129 S. Ct. 808, 816 (2009). A right is clearly established only if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004); see also Mlodzinski v. Lewis, Nos. 10-1966, 10-1967, 2011 WL 2150741, at *6 (1st Cir. June 2, 2011).

A plaintiff bringing a Bivens action "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[6] Iqbal, 129 S. Ct. at 1948. There is no vicarious liability. See id. (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).

As to an assertion of supervisory liability, we held in Maldonado that a supervisor may not be held liable for the

---

[6] Although one line of Soto-Torres's complaint alleges he was unlawfully arrested, the remainder of the complaint makes clear that the purported basis for Soto-Torres's claim is not that he was unlawfully arrested, but rather that he was detained, allegedly, in violation of the Fourth Amendment. In the Fourth Amendment context, to make out a claim of unlawful detention, the plaintiff must sufficiently allege that the detention was not supported by reasonable suspicion. Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009). Soto-Torres also alleges that excessive force was used. To make out a claim of excessive force, the standard is whether the force used was unreasonable under the circumstances. Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007); see also Mlodzinski v. Lewis, Nos. 10-1966, 10-1967, 2011 WL 2150741 (1st Cir. June 2, 2011) (addressing claim of excessive force in qualified immunity framework and ordering immunity on claims of prolonged detention in handcuffs).

constitutional violations committed by his or her subordinates, unless there is an "'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation."  568 F.3d at 275 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)) (internal quotation marks omitted).[7]

In determining whether the facts alleged in the complaint are sufficient to survive the Rule 12(c) motion, we employ a two-pronged approach.  The first prong is to identify the factual allegation and to identify statements in the complaint that merely offer legal conclusions couched as facts or are threadbare or conclusory.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  "[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'"  Peñalbert–Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 557 n.5).

The second prong is to ask whether the facts alleged would "allow[] the court to draw the reasonable inference that the

_____

[7] In Maldonado we observed that "recent language from the Supreme Court may call into question our prior circuit law on the standard for holding a public official liable under § 1983 [and Bivens] on a theory of supervisory liability." Maldonado, 568 F.3d 263, 274 n.7 (1st Cir. 2009) (citing Iqbal, 129 S. Ct. at 1948). However, as in Maldonado, "[w]e need not resolve this issue . . . because we find that [Soto-Torres has] not pled facts sufficient to make out a plausible entitlement to relief under our previous formulation of the standards for supervisory liability." Id.

-10-

defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted).

When a complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

B.        The Insufficiency of the Complaint

Soto-Torres essentially brings this suit on a theory of supervisory liability. The only allegations in the complaint linking Fraticelli with the detention of Soto-Torres are that Fraticelli "was the officer in charge during the incident" and that he "participated in or directed the constitutional violations alleged herein, or knew of the violation[s] and failed to act to prevent them." Iqbal and our precedents applying it make clear that these claims necessarily fail.

As our discussion of the law of supervisory liability makes clear, the allegation that Fraticelli was "the officer in charge" does not come close to meeting the required standard.

While the complaint states that Fraticelli "participated in or directed the constitutional violations alleged herein," it provided no facts to support either that he "participated in" or "directed" the plaintiff's detention. In some sense, all high officials in charge of a government operation "participate in" or "direct" the operation. Iqbal makes clear that this is plainly insufficient to support a theory of supervisory liability and fails as a matter of law.

For the complaint to have asserted a cognizable claim, it was required to allege additional facts sufficient to make out a violation of a constitutional right. Those additional facts would then be measured against the standards for individual liability. The complaint would have had to plead facts supporting a plausible inference that Fraticelli personally directed the officers to take those steps against plaintiff which themselves violated the Constitution in some way. Such a pleading would then have been tested to see whether the standards for immunity had been met. But in this case, the complaint does not even meet the first prong of our two-part Iqbal inquiry.

Our precedents make clear that it is not enough to state that a defendant "was the officer in charge during the incident"

-12-

and that he "participated in or directed the constitutional violations" alleged. We so held in Maldonado,[8] where we dismissed a claim against a mayor who promulgated a no-pets policy in municipal housing properties that led to the killing of pets by subordinate officials. 568 F.3d at 273-74. We explained the dismissal by observing that the mayor's alleged level of involvement in the killing of the pets was "insufficient to support a finding of liability," id. at 273, even though the complaint alleged that the mayor observed one of the raids and "supervised, directly or indirectly, the agencies involved," id. at 274. The complaint identified "no policy which authorized the killing of the pets, much less one which the Mayor authorized." Id. at 273. It is also the effect of our ruling in Peñalbert-Rosa, where we held that a complaint did not sufficiently allege the involvement of a governor in the alleged politically motivated termination of the plaintiff, who worked at the governor's mansion. 631 F.3d at 595.

---

[8] The district court erred as a matter of law when it disregarded this clear statement in Maldonado. The district court treated the reasoning of Maldonado as inapplicable to this case because the portions of Maldonado that laid out the requirements for supervisory liability concerned a Fourteenth Amendment substantive due process claim, whereas here, Soto-Torres attempts to state a supervisory liability theory for violation of his Fourth Amendment rights. However, the constitutional source of a plaintiff's claims are irrelevant to this court's analysis of whether a plaintiff has satisfactorily articulated a supervisory liability theory. Neither Maldonado nor Iqbal suggest that supervisory liability theories should be treated differently based on whether they are made to support a claim under the Fourth Amendment or the Fourteenth Amendment.

-13-

The complaint merely stated that the governor was in charge of approving all personnel decisions at the mansion, including the termination of the plaintiff, and that the governor "knew or assumed" that the plaintiff belonged to a different political party. Id.[9]

Soto-Torres's allegations about Fraticelli's active involvement are no more concrete than those of the plaintiff in Iqbal. The plaintiff in Iqbal alleged that Attorney General Ashcroft and FBI Director Mueller "knew of, condoned, and . . . agreed to subject" him to harsh conditions of detention, and that Ashcroft was the "principal architect" of the policy that led to his detention and that Mueller was "instrumental" in adopting and executing it. Iqbal, 129 S. Ct. at 1951. The Court deemed those bare allegations to be too conclusory to be "entitled to the assumption of truth." Id.

As to Soto-Torres's alternative formulation that Fraticelli "knew of the violation[s] and failed to act to prevent them," his factual allegations are again insufficient. The

---

[9]     Pineda v. Toomey, 533 F.3d 50 (1st Cir. 2008), a pre-Iqbal case in this circuit, also supports the proposition that stating that a defendant was "in charge," without more, is insufficient to support a theory of supervisory liability. Id. at 54-55 (holding that plaintiff failed to "affirmatively link[]," id. at 55, defendant Boston Police sergeants to alleged constitutional violations by subordinate officers where defendant sergeants neither authorized nor witnessed alleged constitutional violations, were not at the scene when alleged violations took place, and were unaware of plaintiff's existence at the time of alleged violations).

-14-

complaint does not provide facts regarding what Fraticelli is alleged to have known when, nor does it specify how he is alleged to have known it, or how he somehow personally caused the detention.

Soto-Torres has been unable to provide adequate facts although he has twice amended his complaint over a period of many years. If Soto-Torres "had any basis beyond speculation for charging [Fraticelli] with knowing participation in the wrong, it seems almost certain that this would have been mentioned." Peñalbert-Rosa, 631 F.3d at 596.

## III.

We reverse and direct judgment in favor of Fraticelli on grounds of qualified immunity.