**Valentino FACEY, Plaintiff,**

v.

**Thomas DICKHAUT, Anthony Mendonsa, and R. Raymond, Defendants.**

**C.A. No. 11–10680–MLW.**

United States District Court, D. Massachusetts.

Signed Sept. 30, 2014.

---

Victoria E. Thavaseelan, Evan D. Panich, Matthew L. Knowles, McDermott Will & Emery, Boston, MA, for Plaintiff.

Joan T. Kennedy, Richard Elkins Gordon, Jr., Department of Correction, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. INTRODUCTION

Plaintiff Valentino Facey brought suit under 42 U.S.C. § 1983 against defendants Thomas Dickhaut, Anthony Mendonsa, and Ronald Raymond. All three defendants are or were officials at the Souza–Baranowski Correctional Center ("SBCC"), operated by the Massachusetts Department of Correction ("DOC"). At the time of the complaint, Dickhaut was the Superintendent of SBCC, Mendonsa was Deputy Superintendent, and Raymond was the assignment officer who made inmate housing recommendations, subject to Mendonsa's approval. Facey, who is currently serving a life sentence in SBCC for murder, alleges that the three defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they knowingly placed him in danger by assigning him to a housing unit, known as the H–1 cell block, where he was isolated from his fellow gang members, leading to an injurious attack by members of a rival gang.

On September 25, 2012, the court allowed in part and denied in part the defendants' Motion to Dismiss. *See Facey v. Dickhaut*, 892 F.Supp.2d 347 (D.Mass. 2012). The court dismissed all claims against the defendants in their official capacities on the grounds of sovereign immunity, and dismissed all claims against Dickhaut because the plaintiff had not adequately alleged that Dickhaut had violated his rights under the Eighth Amendment. The claims against Mendonsa and Raymond in their individual capacities, however, survived the motion to dismiss.

Following the completion of discovery, the remaining defendants moved for summary judgment. The defendants argue that, based on the evidence developed in discovery, there are no genuine disputes of material fact and that they are, therefore, entitled to have the constitutional question summarily decided in their favor. They also argue that, even if there are facts sufficient to support a claim of deliberate indifference in violation of the Eighth Amendment, they are nevertheless shielded by qualified immunity.

The defendants have also filed a Motion to Strike Affidavit in Support of Motion, asking the court to strike Exhibit 11, an article from the *Boston Globe,* from the plaintiff's opposition to the motion for summary judgment. The defendants argue that because this article is hearsay and would not be admissible at trial, the court

may not consider it in evaluating the motion for summary judgment.

In addition to his opposition to the motion for summary judgment, the plaintiff has filed a Motion to Strike Portions of the Affidavit of Anthony Mendonsa. The plaintiff contends that Mendonsa's affidavit, which was filed with the defendant's memorandum in support of their motion for summary judgment, contains information about which Mendonsa lacks "personal knowledge" and, therefore, the court should exclude it for failure to satisfy Federal Rule of Civil Procedure 56(c)(4), which specifies the kinds of evidence a court may consider in deciding a motion for summary judgment.

The plaintiff also objects to the defendants' use of various prison records, which were not provided in discovery and which were first mentioned in the defendants' reply brief.

For the reasons explained below, the court is allowing the defendants' motion to strike, allowing in part and denying in part the plaintiff's motion to strike, allowing the defendants' assented-to motion for leave to file late, allowing the defendant's motion for leave to file under seal, and denying the defendants' motion for summary judgment.

## II. BACKGROUND AND PROCEDURAL HISTORY

Facey is an inmate at Souza–Baranowski Correctional Center ("SBCC"), where he is serving a life sentence without possibility of parole for murder. On April 14, 2011, Facey filed a *pro se* complaint against three defendants in their official and individual capacities. As indicated earlier, they were: Dickhaut, then the Superintendent of SBCC; Mendonsa, then the Deputy Superintendent or SBCC; and Raymond, then a sergeant and Assignment Officer at SBCC. The complaint alleges a single count pursuant to 42 U.S.C. § 1983 for violation of Facey's rights under the Eighth Amendment, stemming from the defendants' alleged failure to protect Facey from severe injuries sustained in an attack by other inmates on June 7, 2010. Facey's complaint seeks damages and other relief.

### A. *The Motion to Dismiss for Failure to State a Claim*

All three defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, raising several arguments. The defendants asserted that the plaintiff's claim should be dismissed because he had failed to exhaust his administrative remedies, as is required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). The defendants also argued that the doctrine of sovereign immunity protected them from being sued in their official capacities for damages, that the complaint did not allege sufficient facts to state a claim for relief under the Eighth Amendment, and that they were entitled to qualified immunity.

The court allowed the motion in part and denied the motion in part. *See Facey v. Dickhaut,* 892 F.Supp.2d 347, 359–60 (D.Mass.2012). The court first rejected the argument that the case should be dismissed because of any failure by the plaintiff to exhaust his administrative remedies. Although the court agreed that exhaustion of administrative remedies is mandatory under the PLRA, *see id.* at 392, the court also explained that failure to exhaust is an affirmative defense and that a plaintiff need not plead or demonstrate exhaustion in his complaint. *See id.* at 354 (citing *Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)). Furthermore, the court stated that even if it could consider Facey's administrative review

process, "the records are not inconsistent with Facey's claim that he did not receive a response to his initial grievance," which would support his contention that any failure to exhaust would not bar his claim. *See id.* at 355.[1]

Second, the court found that the sovereign immunity preserved by the Eleventh Amendment protected the defendants from the claims for money damages against them in their official capacities. *See id.* (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

Third, the court found that the complaint was sufficient to state a claim against defendants Mendonsa and Raymond, explaining that:

The complaint alleges that "[t]he Defendants" were aware of the feud between the Bloods and the Gangster Disciples, that the plaintiff is a "known member" of the Bloods, that "[a]ll prisoners" are checked for enemy situations before being housed, and that "[t]he Defendants" placed him on the South Side of the facility, where all the Gangster Disciples reside. It further alleges that Mendonsa assigns "all prisoners" to their housing areas, and that Raymond is the Assignment Officer and carries out his orders. Although the plaintiff might have more artfully stated a claim against these officials by alleging that Mendonsa and Raymond assigned him to be housed on the South Side, both of these allegations can be readily inferred from the complaint itself. "[L]iberally construed," the *pro se* complaint sufficiently alleges that Mendonsa and Raymond knowingly disregarded a substantial risk of serious harm to the plaintiff by housing him in an area with his known enemies.

*Facey*, 892 F.Supp.2d at 356 (alterations in original) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)).

However, the court found that the plaintiff had not adequately stated a claim against Superintendent Dickhaut. Noting that the doctrine of *respondeat superior* does not apply to alleged constitutional violations, *see id.* at 357 (citing *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 49 (1st Cir. 2009)), the court concluded that the complaint's minimal "allegations of [Dickhaut's] knowledge and direct participation [were] too 'threadbare' and 'speculative' to be accorded the presumption of truth, particularly given the absence of any other allegation specifically linking Dickhaut to the events of the case," *id.* (quoting *Penalbert–Rosa v. Fortuno–Burset*, 631 F.3d 592, 595 (1st Cir.2011)). Accordingly, the court dismissed the claims concerning Dickhaut. *See id.*

Finally, the court rejected the defendants' argument that the complaint should be dismissed because the defendants were shielded by qualified immunity, which "prevents suits against federal and state officials for money damages 'unless (1) the facts alleged or shown by the plaintiff make out a violation of a constitutional right and (2) such right was clearly established at the time of the defendants' alleged violations.'" *Id.* (quoting *Feliciano–Hernandez v. Pereira–Castillo*, 663 F.3d 527, 532 (1st Cir.2011)).

The court found that, because the inquiry under the first prong was identical to the inquiry into whether the complaint had stated a claim under the Eighth Amendment, it was satisfied with respect to Mendonsa and Dickhaut. Next, the court concluded that the pleadings were adequate to satisfy the second prong, finding that the

---

1. The defendants have not renewed this argument in their motion for summary judgment.

right the defendants were alleged to have violated was clearly established and that if the alleged facts were proven, "a reasonable defendant would have understood that his conduct violated the [plaintiff's] constitutional rights." *Id.* at 359 (alteration in original) (quoting *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir.2009)) (internal quotation marks omitted).

In summary, the court dismissed all of the claims against Dickhaut, and dismissed the claims against Mendonsa and Raymond in their official capacities, but not in their individual capacities.

**B.** *The Motion for Summary Judgment*

At the outset of the case, the court denied without prejudice the plaintiff's Motion to Appoint Counsel. *See* June 27, 2013 Memo. & Order at 3. After the completion of discovery, the plaintiff renewed his request. The court allowed the motion and appointed Victoria Thavaseelan, Esq., of McDermott Will & Emery LLP, to serve as Facey's counsel. Defendants filed a motion for summary judgment, which plaintiff opposed, and defendants filed a reply.

On May 23, 2014, the court held a hearing on the defendants' motion for summary judgment, as well as related motions regarding the evidence that the court could consider when deciding whether summary judgment is appropriate. The court then took the motion for summary judgment under advisement. The court also ordered the plaintiff to request any additional discovery concerning the inmate populations on the North and South Sides of SBCC by May 30, 2014, and ordered the defendants to respond to any such request by June 13, 2014. *See* May 27, 2014 Order. The court subsequently granted the defendants an extension until July 31, 2014, to respond to

the plaintiff's discovery request. *See* June 30, 2014 Order.

### III. MOTIONS TO STRIKE

Because the motions to strike bear on the evidence that the court may consider in deciding the defendants' motion for summary judgment, it is considering them first. However, because these motions to strike involve the admissibility of evidence concerning matters that occurred after the complaint was filed, the resolution of these motions does not affect the merits of the motion for summary judgment.

**A.** *Legal Standard*

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." In deciding a motion for summary judgment, "a court may take into account any material that would be admissible or usable at trial ... [but] inadmissible evidence may not be considered." *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993). If evidence cannot be presented in a form that would be admissible at trial, the court may not rely on it. *See* Fed.R.Civ.P. 56(c)(2); *Gorski v. N.H. Dep't of Corr.,* 290 F.3d 466, 475–76 (1st Cir.2002); *Vazquez v. Lopez-Rosario,* 134 F.3d 28, 33 (1st Cir.1998).

A motion to strike is the appropriate means of objecting to the use of affidavit evidence on a motion for summary judgment. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668, 682 (1st Cir.1994). "The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection. Furthermore, a court will disregard only those portions of an affidavit

that are inadmissible and consider the rest of it." *Id.* (citation omitted); *see also Perez v. Volvo Car Corp.,* 247 F.3d 303, 315–16 (1st Cir.2001).

### B. *Plaintiff's Motion to Strike*

First, the plaintiff has filed a motion to strike several portions from the affidavit of defendant Mendonsa (Defs.' Memo, in Supp. of Mot. for Summ. J. Ex. 1). In particular, the plaintiff objects to the admission of paragraphs 12, 14–15, 17–21, 26, and 31 of that affidavit "on the grounds that the sworn statements in those paragraphs are not based on personal knowledge, do not contain admissible facts, or both." Pl.'s Mot. to Strike ¶ 2.

As Mendonsa states in his affidavit, he retired from the DOC on June 30, 2012. *See* Mendonsa Aff. ¶ 1. However, at several points in the affidavit, Mendonsa refers to Facey's activities in the Massachusetts correctional system after Mendonsa's retirement. *See, e.g.,* Mendonsa Aff. 112(5) (noting that Facey received counseling "on May 9, 2013, when he was transferred to lower security to MCI–Shirley"). For many of these statements, Mendonsa cites prison disciplinary records created after his retirement. For other statements, however, no such citations are provided. Accordingly, the plaintiff argues that Mendonsa lacked personal knowledge of those activities, and that any assertions in Mendonsa's affidavits not based on personal knowledge should be stricken from the record. The plaintiff does not, however, claim the statements at issue are not relevant.

The defendants make two arguments for the admissibility of the statements based on the prison reports. First, they assert that the statements are not hearsay because the reports are not offered for their truth. More specifically, they contend that, "[t]he DDU Hearing Package is not offered to prove that plaintiff engaged in the obstreperous conduct noted therein." Defs.' Mot. in Opp. to Pl.'s Mot. to Strike at 2. Second, they argue that even if the reports contain hearsay, they fall under the business records exception created by Federal Rule of Evidence 803(6).

The relevance of information about Facey's prison history after the June 2010 attack is unclear, largely because the focus of the deliberate indifference standard is what the prison officials knew at the time the inmate was injured. Accordingly, this information does not affect the analysis concerning the alleged constitutional violation.

█ The defendants do not explain any other purpose to which the prison reports might be put beyond their admission for the truth. They imply that they relate to the prison officials' knowledge and beliefs concerning Facey's behavior as a prisoner, which would bear upon the reasonableness of their decision to place him in the H–1 cell block, where he was attacked.

The documents in dispute appear to be admissible under either Rule 803(6), as business records, or Rule 803(8), as public records. *See United States v. Chong,* 98 F.Supp.2d 1110, 1118–19 (D.Haw.1999) (finding that prison disciplinary records fell within ambit of Rule 803(6)); *Ellis v. Capps,* 500 F.2d 225, 226 n. 1 (5th Cir. 1974) (prison records admissible as official records). As the defendants note, "prison administrators, particularly with regard to inmate disciplinary records, ... are required to maintain such records by state regulation." Defs.' Opp. to Mot. to Strike at 3 (citing 103 Mass.Code Regs. § 430.17(4)).

Motions to strike have been denied even when the declarant did not personally experience the matters discussed in the affidavit, but did review business or public

records and included information from those records with the affidavit. *See, e.g., Bay State Sav. Bank v. Baystate Fin. Servs., LLC,* C.A. No. 03–40273–FDS, 2007 WL 6064455, at *9 (D.Mass. Mar. 23, 2007) (Saylor, J.) (citing cases) ("Although the affiants in the cases defendant cites were not present when the relevant events occurred, they later learned what had happened and explained the basis for their knowledge. Furthermore, all documents forming the basis of their testimony were attached to their affidavits."). Here, Mendonsa reviewed the records, which evidently fall within a hearsay exception, and has cited them in his affidavit. Therefore, at least where Mendonsa has cited business/public records—paragraphs 17, 18, 19, 21, and 26—the motion to strike is being denied.

However, the motion is being allowed with respect to paragraphs 12, 14, 15, 20, and 31 of Mendonsa's affidavit. These paragraphs include information of which Mendonsa has not demonstrated personal knowledge, and each lacks any reference to prison reports. The defendants have offered no argument to support their contention that he had personal knowledge of these events.

### C. *Defendants' Motion to Strike*

The defendants have moved to strike Exhibit 11 of the Knowles Affidavit, provided by the plaintiff in opposition to the motion for summary judgment. *See* Defs.' Mot. to Strike.

Exhibit 11 is a copy of a June 19, 2012 *Boston Globe* article entitled "Shirley Prison Chief Removed," which states that Mendonsa was removed from his position as SBCC Superintendent on June 8, 2012, and would be officially retiring on June 30, 2012. *See* Knowles Aff. Ex. 11. The article reports that although the reasons for Mendonsa's retirement were not officially disclosed, unidentified state officials had stated that Mendonsa's removal was linked to allegations that he had sexually harassed a female staff member. *See id.*

The defendants argue that this newspaper article, which contains no quotations or other admissions by Mendonsa, "is being offered to prove the truth of the matter asserted and constitute[s] impermissible hearsay under Fed.R.Evid. 801(c)." Defs.' Mot. to Strike at 2.

Defendants' motion to strike is being allowed. The *Boston Globe* article is not relevant to the plaintiff's claim, and, in any event, is inadmissible hearsay. *See Horta,* 4 F.3d at 8–9 (holding that because newspaper article was hearsay, it could not be considered in deciding motion for summary judgment).

As a practical matter, the exclusion of this exhibit is not material. It is undisputed that Mendonsa left the DOC in June 2012. *See* Mendonsa Aff. ¶ 1; Mendonsa Dep. 89:7–8, Knowles Decl. Ex 9. The reason for his departure is not relevant to the reasonableness of his actions in 2010.

## IV. OTHER MOTIONS CONCERNING EVIDENCE

There are two other pending motions that affect the information the court may consider in deciding the motion for summary judgment. Therefore, they are being decided before the court addresses the motion for summary judgment.

### A. *Defendants' Assented–To Motion for Leave to File Late*

The defendants request leave to file three documents: (1) Defendants' Reply to Plaintiff Valentino Facey's Declaration/Affidavit in Support of His Opposition to Defendants' Motion for Summary Judgment; (2) Defendant's Reply to Plaintiff Valentino Facey's Statement of Additional

Material Facts in Support of His Opposition to Defendants' Motion for Summary Judgment; and (3) Defendant's Reply to Plaintiff Valentino Facey's Response to Defendant's Statement of Material Undisputed Facts in Support of Defendants' Motion for Summary Judgment.

The defendants note that they complied with the February 28, 2013 deadline for the submission of their reply to Facey's opposition. However, they acknowledge that they did not timely file these three documents alone with their reply. The plaintiff does not oppose this motion for leave to file late. It is being allowed.

## B. *Defendants' Motion for Leave to File Unredacted Copies of Inmates' Prison Records Under Seal*

The second motion is a request from the defendants to file unredacted versions of various prison records. Although the caption for this motion may suggest that it presents a minor issue, the plaintiffs' opposition raises substantial questions about the evidence and arguments that the court should consider in deciding the motion for summary judgment.

The redacted versions of these prison records were included with the defendants' reply to the plaintiff's opposition to the motion for summary judgment. In part, these records provide data on inmates in the H–1 housing block, where Facey was attacked, as well as data on Security Threat Group ("STG") inmates in other South-side housing blocks. The defendants have offered these records to support their claim that H–1 was a relatively safe place to house Facey, and to refute Facey's claim that he was the only member of the Bloods in H–1 when he was attacked.

The plaintiff opposes this motion. Although the plaintiff does not object to these documents being filed under seal, he does oppose the consideration of them in deciding the motion for summary judgment. Facey argues that these documents were not produced during discovery, despite being covered by the discovery request for "[a]ll documents . . . concerning the decision to house Mr. Facey in a particular unit, cell block, area, or division of [SBCC]." Opp. to Mot. at 1 n. 1; *accord* Knowles Decl. Ex. 1 ¶ 4. Furthermore, Facey argues that these records are incomplete because they "contain no information about [the STG composition of] the remaining units on the South Side or any units on the North Side of the prison." Opp. to Mot. at 2.

"Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion." *McCoy v. MIT*, 950 F.2d 13, 22 n. 7 (1st Cir.1991); *see also CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1526 (1st Cir. 1996). Therefore, "[a]rguments raised for the first time in a reply memorandum will not be considered." *Rivera Concepcion v. Puerto Rico*, 682 F.Supp.2d 164, 170 n. 5 (D.P.R.2010); *see also Berwind Prop. Grp. Inc. v. Envtl. Mgmt. Grp., Inc.*, Civ. A. No. 04–11411–NMG, 2007 WL 4707647, at *6 (D.Mass. Feb. 5, 2007) (Gorton, J.) ("[D]efendant . . . will not be permitted to amend the nature of its motion in a reply brief."); *Graham v. Sabol*, 734 F.Supp.2d 194, 199 (D.Mass.2010) (Bowler, M.J.) ("A reply brief is not an opportunity to raise new arguments. . . .").

Here, the defendants' proposed reply brief goes well beyond rebuttal of the legal and factual arguments presented in the plaintiff's opposition to the motion for summary judgment. The defendants have supplied new affidavits and a variety of prison records that are offered to show that "the H–1 Unit was a suitable place-

ment" for Facey. Defs.' Reply to Pl.'s Opp. to Mot. for Summ. J. at 7. Most importantly, the defendants offer this evidence in support of their argument that there were two other Bloods inmates in H–1 when Facey was attacked, which would undermine his claim that he was the lone Blood in the unit. *See id.* at 9. They also provide evidence of the STG composition of other South-side housing units to argue that Facey's placement in H–1 was reasonable in light of the alternatives. *See* Defs.' Reply Ex. 8.

The defendants' request to file these documents under seal is being allowed only. However, these documents, and the others that were included with the defendant's reply to Facey's opposition to the motion for summary judgment, are not being considered in deciding the motion for summary judgment. These documents were not provided in discovery. Plaintiff has not had an opportunity either to review these documents in context or to file a memorandum addressing how these documents affect the summary judgment analysis. The prejudice from the untimely introduction of these records is potentially significant. Furthermore, because these documents do not show how the composition of the South-side units compared to the composition of those on the North side, they provide an incomplete and possibly misleading portrait of the information that was available to the defendants when they assigned Facey to H–1. *Cf.* Fed.R.Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.").

However, as the court explained at the May 23, 2014 hearing, this information may be relevant to the merit of Facey's

claims. Therefore, the court allowed limited additional discovery "relating to any documents and statistics regarding the inmate populations in the North and South Sides of the Souza–Baranowski Correctional Center ("SBCC") on June 7, 2010." May 27, 2014 Order. The evidence obtained from such discovery, if admissible, may be used at any eventual trial.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons explained below, the court is denying the motion of both defendants for summary judgment.

### A. *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment is, therefore, appropriate only if there exists no factual dispute that is both "material" and "genuine." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." *Maymi v. P.R. Ports Auth.,* 515 F.3d 20, 25 (1st Cir.2008); *Martinez–Rodriguez v. Guevara,* 597 F.3d 414, 419 (1st Cir.2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

To determine if a factual dispute is "genuine," the court must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 43 (1st Cir.2009) (quoting *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505)

(internal quotation marks omitted); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir.2009). In making this determination, the court must "constru[e] the record in the light most favorable to the nonmoving party." *Douglas v. York Cnty.*, 433 F.3d 143, 149 (1st Cir.2005); *accord Montalvo v. Gonzalez–Amparo*, 587 F.3d 43, 46 (1st Cir.2009). However, "the evidence *from the moving party* as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment." *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir.2010) (citing *LaFrenier v. Kinirey*, 550 F.3d 166, 167 (1st Cir.2008)).

The record should not be scrutinized piecemeal, but rather must be "taken as a whole." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As indicated earlier, evidence submitted in inadmissible form may be considered only if it could, at trial, be presented in admissible form. *See* Fed.R.Civ.P. 56(c)(2); *Gorski*, 290 F.3d at 475–76; *Vazquez*, 134 F.3d at 33.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

█ A defendant's state of mind is a component of a deliberate indifference claim. As the First Circuit has explained:

> [C]ases . . . in which state of mind is at issue do not usually lend themselves to summary judgment. . . . "[G]reat circumspection is required" in such circumstances and a trial is appropriate as long as the party opposing summary judgment has given "some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim."

*Maiorana v. MacDonald*, 596 F.2d 1072, 1076–77 (1st Cir.1979) (quoting *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975)); *see also* 10B Wright, Miller, & Kane, *Federal Practice and Procedure* § 2730 (3d. ed.1998).

## B. *Facts*

The following facts are derived from the evidence viewed in the light most favorable to the plaintiff, with all reasonable inferences drawn in his favor. *See Burrell v. Hampshire Cnty.*, 307 F.3d 1, 3 (1st Cir. 2002).

### 1. *The Parties*

Facey is serving a life sentence, without the possibility of parole, for murder. He is incarcerated at SBCC, a maximum-security prison operated by the Massachusetts DOC.

Mendonsa was the Deputy Superintendent of Classification and Treatment at SBCC in June, 2010, when the events upon which this case is based occurred. Mendonsa was subsequently promoted to Superintendent in 2011, and retired in 2012. *See* Mendonsa Aff. ¶ 1; Mendonsa Dep. 89:1–8, Knowles Decl. Ex. 9. As Deputy Superintendent, Mendonsa was responsible for determining the security level at which inmates should be placed and oversaw cell assignments through his direct supervision of Assignment Officer Raymond, the other remaining defendant. Raymond was responsible for cell assignments at the time of the events at issue, and he made about fifty cell assignments on the average day. *See* Raymond Aff.

¶ 3, Defs.' Memo, in Supp. Ex. 12. Raymond's initial decisions were then reviewed by Mendonsa, who ultimately approved the assignments. *See* Mendonsa Aff. ¶ 4.

### 2. *Souza–Baranowski Correctional Facility*

SBCC, which has 1638 beds, is designed with a central hub flanked by North and South sides, each of which is divided into several units. On the first two floors of each side are eight housing units, which each have two levels and a total of 64 cells. *See* Raymond Aff. ¶ 2. The North and South sides also each contain a Special Management Unit ("SMU") on the third floor, which typically houses inmates who have had recent disciplinary problems. *See* Mendonsa Dep. 40:2–19; Raymond Aff. ¶ 2. The SMU places the most restrictions on inmate liberty; they are fed in their cells, handcuffed when they are outside their cells, and shower and exercise alone. *See* Facey Decl. ¶ 4.

Most housing units are "general population" units, in which inmates have freedom to move about and interact with inmates from other units. However, the North and South sides each contain an "orientation unit," which is more restrictive than the general population units, and in which inmates receive information about SBCC programs and policies. After booking, new inmates are placed in such orientation units. In addition to housing new inmates, orientation units are often, but not always, the first stop for inmates leaving the SMU; this practice is meant to facilitate their reintegration into the general prison population. *See* Mendonsa Dep. 42:8–24. Exceptions to this general rule might be appropriate if, for example, the inmate leaving the SMU has known enemies in the orientation units. *See* Mendonsa Dep. 42:8–24.

Of the 1200 to 1300 inmates housed at SBCC, about 70% are confirmed or suspected members of an STG, more commonly known as a prison gang. *See* Raymond Aff. ¶ 4. The "Bloods" and "Gangster Disciples" are two such STGs. *See* Raymond Dep. 33:12–16.

Inmate housing decisions at SBCC take into account an array of factors. These decisions are based in part on the requirements of the Prison Rape Elimination Act of 2003 ("PREA"), Pub.L. No. 108–79, which "requires that correctional facilities determine, when an inmate is initially booked, and during his incarceration, whether the inmate, being booked, presents as a predator, as a victim[,] or a combination of both." *See* Raymond Aff. ¶¶ 6–10; Mendonsa Aff. ¶ 10. As Raymond has described the essence of the housing assignment process, there were three primary factors taken into consideration. "Enemies are checked first before anything," which involves looking in the Inmate Management System ("IMS") database. *See* Raymond Dep. 15:18, Knowles Decl. Ex. 10. Raymond would next examine an inmate's STG status, also using IMS, but the database did not indicate which other STGs would generally be hostile to that inmate. *See* Raymond Dep. 16:18–20. Finally, he would examine an inmate's disciplinary records. *See* Raymond Dep. 23:1–2.

The IMS computer database Raymond used includes the Housing Risk Assessment Tool ("HRAT"), an electronic system into which inmate information is entered by Correctional Program Officers ("CPOs"), medical staff, and mental health staff. *See* Raymond Aff. ¶¶ 5–7. The HRAT database contains listings of any known, reported conflicts that an inmate has with other inmates. New inmates are given an opportunity to report any potential conflicts and are encouraged to report such conflicts at any time while they are in prison. *See* Mendonsa Aff. ¶¶ 10–11; Ray-

mond Aff. ¶ 6. The Inmate Intake Form, to be completed by every new inmate during booking, requires the inmate to acknowledge that he has had an opportunity to report any conflicts with other inmates. *See* Mendonsa Aff. ¶ 11; Raymond Aff. ¶ 6; Facey Dep. at 98, 100–102. However, as Facey stated in his affidavit, "[i]nmates may not be able to report conflicts for a variety of reasons, including fear of retaliation, characterization as a 'snitch,' or lack of ability to sufficiently identify the name of the inmate with whom the conflict exists." Facey Decl. ¶ 17.

In the process of making his housing decisions, Raymond would use the HRAT database and run a conflict check to ensure that an inmate would not be placed in the same cell or housing unit as an inmate with whom he had an identified conflict. *See* Raymond Aff. ¶ 8. In making housing decisions, Raymond had "no input, control or ability to override the information placed into the Housing Risk Assessment tool." Raymond Aff. ¶ 7.

In addition to the formal conflict check, the HRAT process also involved looking at an inmate's recent disciplinary and incident reports. Once Raymond completed this process for all inmates for whom he was recommending a housing transfer, he would circulate his list of proposed transfers to Inner Perimeter Security ("IPS"), the Director of Security, the Deputy Superintendent of Operations, and the Deputy Superintendent of Classification and Treatment, who, at the time of the attack on Facey, was Mendonsa. *See* Raymond Depo. ¶ 10.

In addition to looking for active inmate-to-inmate conflicts, Raymond would look for other compatibility factors, including the physical sizes, ages, crimes of conviction, and sentences of inmates who might be housed together. Prison officials also considered "balance" to be important with respect to the racial and STG composition of housing units. *See* Raymond Aff. ¶ 9. The parties agree that "the worst scenario is where a single member of one [STG] is housed with a group of members of a rival [STG]: the individual member is at risk of attack and has no protection from fellow gang members." Pl.'s Statement of Add'l Material Facts ¶ 3; Defs.' Reply to Pl.'s Statement of Add'l Material Facts ¶ 3.

The parties disagree about the existence of an unofficial policy concerning the segregation of Bloods from Gangster Disciples. The defendants deny that such a policy existed. *See* Defs.' Reply to Pl.'s Statement of Additional Material Facts 1114. However, in his deposition, Raymond testified that, although STG members were housed throughout SBCC, it was his practice when making housing assignments to place Bloods mainly on the North side and to place Gangster Disciples mainly on the South side. *See* Raymond Dep. 40:2–9, 42:16–20. Raymond testified that this practice was used to reduce the risk of fights among inmates. *See* Raymond Dep. 43:4–6.

Accordingly, Facey has presented sufficient evidence to allow a reasonable jury to conclude that SBCC officers had an unofficial policy of housing most Bloods on the North side and most Gangster Disciples on the South side. However, there is no evidence to suggest that this policy was categorical. As Facey acknowledged in his deposition, there were several Bloods housed on the South side when he was attacked. *See* Facey Dep. at 61–62, Def's Memo, in Supp. of Reply Ex. 1.

### 3. *Facey's History at SBCC*

Facey arrived at SBCC on October 7, 2008. *See* Facey Decl. ¶ 2. From his arrival until the attack on June 7, 2010, Facey was almost always housed on the North side, with only two South-side assign-

ments. The first such assignment was a two-month stay in unit J–2 in 2008, prior to his affiliation with the Bloods. *See* Facey Decl. ¶ 2; Facey Inmate Bed Management List at 5, Defs.' Memo. in Supp. Ex. 9. The second was in August 2009, when he was kept in the South-side SMU following a fight, which is described below. *See* Facey Decl. ¶ 4; Facey Inmate Bed Management List at 4.

As explained earlier, SBCC employed a system by which inmates could report that they had conflicts with other inmates or otherwise had enemies in the facility. As Facey concedes, he signed waivers stating that he lacked any active conflicts or enemies, and he declined to inform prison officials of any such conflicts. *See* Facey Dep. 107:3–8.

In the summer of 2009, while housed on the North side, Facey became a member of the Bloods STG. *See* Facey Dep. 30:4–6. As a new "soldier" in the gang, Facey was assigned to attack "Inmate L," a senior leader of the Gangster Disciples. On August 15, 2009, Facey and two other Bloods attacked Inmate L in the dining hall. *See* Facey Dep. at 91–96. A subsequent disciplinary report categorized the fight as gang related, describing the incident as a "3 on 1 Security Threat Group physical assault on inmate [L] (Gangster Disciples)" and identifying Facey as a member of the Blood STG. Knowles Decl. Ex. 4. On September 1, 2009, the Superintendent approved a conflict form that showed a direct conflict between Inmate L and Facey. *See* Knowles Decl. Ex. 1. As Facey has acknowledged, on September 30, 2009, he received official notification that the DOC had identified him as a member of the Bloods STG. *See* Facey Dep. at 21.

Facey was sent to the South-side SMU as punishment following the August 2009 fight. Upon his release from the SMU in November 2009, he was transferred back to a North-side general population unit. In the North-side unit, Facey was protected by fellow Bloods members from retribution from Gangster Disciples. *See* Facey Decl. ¶ 6.

Several months later, on May 14, 2010, Facey and another Bloods member attacked "Inmate M," whom they believed to have sexually assaulted another Bloods member. *See* Facey Decl. ¶ 6. All three inmates involved in the fight were sent to the SMU. *See* Mendonsa Aff. ¶ 27.

#### 4. *June 7, 2010 Transfer to H–1 and Attack*

On June 7, 2010, Facey was released from the SMU on the orders of prison supervisors, including Mendonsa. *See* Mendonsa Dep. 41:1–19. Instead of being assigned to a North-side unit, as he had been prior to the fight with Inmate M, Facey was assigned to unit H–1, a general population unit on the South side. In their initial affidavits, both defendants claimed that H–1 was a more restrictive "orientation unit." *See* Mendonsa Aff. ¶ 29; Raymond Aff. 113. Raymond also made this assertion in his deposition. *See* Raymond Dep. 15:7–9.[2] However, after this contention was challenged by the plaintiff, the defendants conceded that H–1 was a general population unit in June 2010. *See* Second Raymond Aff. ¶ 3.; Second Mendonsa Aff. ¶ 1; Defs.' Reply to Pl.'s Response to Defs.' Statement of Material Undisputed Facts ¶ 12.

The factual crux of the case is the information that the defendants relied upon in assigning Facey to unit H–1. As explained

---

**2.** In his deposition, which predated his first affidavit, Mendonsa stated that H–1 was a general population unit, not an orientation unit. *See* Mendonsa Dep. 52:15–18. The reasons for the discrepancy in his affidavit are unclear.

earlier, the parties agree that the usual practice upon an inmate's release from the SMU was to assign him to an orientation block, though the defendants claim that this is not a formal policy.

In his first affidavit, Raymond indicated that he did not recommend that Facey be transferred back to a North-side unit because Inmate M, who was determined to be the victim in the May 2010 fight, had previously been released from the SMU, shortly after the fight, and had returned to the North side. *See* Raymond Aff. ¶ 14. Similarly, Mendonsa stated that Inmate M "was released first from the SMU. Because he was the victim, [he] was returned back to the North Side." Mendonsa Aff. ¶ 28.

However, Facey disputes this account. Facey notes that SBCC inmate records indicate that Inmate M was actually released from the SMU on July 6, 2010, nearly a month *after* Facey was transferred to H–1. *See* Knowles Decl. Ex. 8 at 1–2. The record does not contain any other evidence discussing why the plaintiffs decided to place Facey on the South side. At the May 23, 2014 hearing, the defendants argued that the decision was motivated by a desire to keep Facey on the more docile South side, but the only evidence in the record is defendants' claimed concern about Inmate M.

In making the initial housing decision, Raymond checked Facey's STG history, which listed Facey as a Blood. *See* Raymond Dep. 62:10–16. Raymond admitted in his deposition that, when he made his proposed housing decision, he knew that Facey was a Blood and that he had been in a fight with the Gangster Disciple leader. *See* Raymond Dep. 84:22 to 85:3.

Facey does not dispute that, on June 7, 2010, Raymond checked with IPS to see if there were any active conflicts between Facey and other H–1 inmates and to see if

IPS had any other objections to the transfer. Raymond found no conflicts and received no negative feedback from IPS. He subsequently placed Facey on the daily movement list in order to solicit feedback from supervising officers. No supervising officer made any objection or provided additional information regarding the transfer. *See* Raymond Aff. 115. Mendonsa admits that he must have seen the proposed inmate movement list, but does not recall playing an active role in the decision. *See* Mendonsa Aff. ¶ 39.

Facey states in an affidavit that there were only a handful of Bloods members on the South side on June 7, 2010, and that he was the only Blood assigned to unit H–1. *See* Facey Decl. ¶ 15. As Facey concedes, however, it is difficult to tell at a glance who is a Blood. *See* Facey Dep. 22:8–14.

The defendants dispute Facey's claim that he was the only Blood in H–1, arguing instead that were two other confirmed or suspected Bloods in H–1 on June 7, 2010. *See* H–1 Inmate Chart, Defs.' Memo, in Supp. of Reply Ex. 6; Colon Decl. 17, Defs.' Memo, in Supp. of Reply Ex. 9. As explained earlier, however, this argument and supporting evidence were first introduced in defendants' reply brief, and the court finds that the inmate records may not be considered in deciding the motion for summary judgment.

Moreover, the inmate housing records belatedly provided by the defendants appear to have been taken from a recent review of the records of the inmates assigned to H–1 on June 7, 2010, and they have not provided evidence that indicates the STG allegiances of those inmates at that time. Instead, the records reflect the *current* STG status of those inmates. Therefore, even if the records were considered, they do not necessarily disprove Fa-

cey's claim that he was the only Blood at the time of the attack.[3]

Officer William Colon, who was an IPS officer on duty on the day of the attack, states that there were two other Bloods in H–1 on June 7, 2010. *See* Colon Aff. ¶ 7. However, Colon's account is also controverted by Facey's affidavit. Moreover, Colon's affidavit was submitted with the defendants' reply. For the reasons explained earlier, it too is not being considered in deciding the motion for summary judgment. Accordingly, there is a genuine dispute about the number of Bloods in H–1 when Facey was attacked.

In his affidavit, Facey states that while being transferred from the SMU to H–1, he became concerned for his safety and asked the guards escorting him to confirm that the unit assignment was correct. *See* Facey Decl. ¶ I7. Despite his concerns about being placed in a South side unit, Facey felt barred from refusing the transfer, which would have earned him a disciplinary "ticket." Facey Decl. ¶ 7. After arriving at H–1, Facey spoke with Colon and said that he should be housed on the North side, rather than the South. According to Facey, Colon responded that the administration planned "to keep [him] on the South side until [he] could show that [he could] stay out of trouble." Facey Decl. ¶ 9.

Following his conversation with Colon, Facey ate dinner with other Bloods members (housed in other South-side units) in the common dining area on the South side, and he then returned alone to H–1. *See* Facey Decl. ¶ 10. Facey was soon attacked by four inmates, at least three of whom were Gangster Disciples.[4] *See* Facey Decl. ¶ 11. Although the parties disagree about whether Facey was left unconscious by the attack,[5] there is no dispute that he sustained a broken jaw. *See, e.g.,* Facey Decl. ¶ 11. There is no evidence in the record concerning the disciplinary history of the four assailants.

Following the attack, Facey was taken to the prison's Health Services Unit, and subsequently received treatment at Boston Medical Center and Shattuck Prison Hospital. *See* Facey Decl. ¶ 12. Facey asserts that he still experiences significant physical and mental pain as a result of the attack. *See id.*

According to prison records, the attack was STG-related retribution for Facey's August 15, 2009 attack on the Gangster Disciple leader. *See* Knowles Decl. Ex. 6. As Raymond admitted in a deposition, with the benefit of hindsight, he would have tried to keep Facey on the North side, and the decision to send Facey to H–1 in 2010 created a "greater likelihood of him being involved with the Gangster Disciples." Raymond Dep. 84:1–7.

---

3. Indeed, the document says that *four* of the H–1 inmates were Gangster Disciple members, despite the defendants' argument elsewhere that, at the time of the attack, only three of the assailants were Gangster Disciple members. *See* H–1 Inmate Chart at 5. This discrepancy reinforces the court's conclusion that these records do not necessarily reflect the inmates' STG status as of June 2010.

4. There is a dispute about the number of Gangster Disciple assailants. Facey asserts that all four of his attackers were Gangster Disciples, but the defendants claim that one of

them became a Gangster Disciple after the attack, which was an initiation ritual of sorts. *See* Colon Aff. ¶ 8. This dispute is not material.

5. The defendants have submitted a security tape that evidently shows that, after he was attacked, Facey was moving on the ground, which they say is inconsistent with a concussion. *See* Defs.' Notice of Manual Filing. For the purposes of this motion, however, this dispute is not material.

## C. *Discussion*

The defendants advance three arguments in support of their motion for summary judgment. First, the defendants argue that the claims against Mendonsa and Raymond in their official capacities should be dismissed. Second, the defendants argue that the evidence is insufficient to prove Facey's Eighth Amendment claims against the defendants in their individual capacities. Third, the defendants argue that, even if the evidence supports an Eighth Amendment claim, the defendants are protected by qualified immunity.

### 1. *Claims Against the Defendants in Their Official Capacities*

The defendants' first contend that the claims against Mendonsa and Raymond in their official capacities are barred by the Eleventh Amendment. However, the court already considered this argument when deciding the defendants' motion to dismiss, found that claims against all defendants in their official capacities must be dismissed, and dismissed those claims. *See Facey*, 892 F.Supp.2d at 355.

### 2. *Claims Against the Defendants in Their Individual Capacities*

#### a. *Legal Standard*

■■■■ The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. Am. VIII. As the Supreme Court has explained:

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). . . . "[A]mong 'unnecessary and wanton' infliction of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

*Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (some internal quotation marks omitted). In the context of inmate safety, the Court has further stated:

The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," *Helling [v. McKinney]*, 509 U.S. [25], 31 [113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) ] . . . . The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

*Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Kosilek v. Spencer*, 889 F.Supp.2d 190, 205 (D.Mass.2012). "In particular, . . . 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Farmer*, 511 U.S. at 833, 114 S.Ct. 1970 (second alteration in original) (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir.1988)).

■■■■ However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834, 114 S.Ct. 1970. "The test for a violation of the Eighth Amendment has both an objective and a subjective component." *Kosilek*, 889 F.Supp.2d at 206. First, "the deprivation

alleged must be, objectively, 'sufficiently serious,' ... [and] [f]or a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Second, the prison official must have had a "state of mind ... of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302–03, 111 S.Ct. 2321).

The subjective standard of "deliberate indifference" is satisfied only when the prison official both "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847, 114 S.Ct. 1970. This standard is analogous to "the standard for criminal recklessness." *Giroux v. Somerset Cnty.*, 178 F.3d 28, 32 (1st Cir.1999); *see also Alsina–Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir.2005) ("Willful blindness and deliberate indifference are not mere negligence; these concepts are directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent.").

In *Farmer*, the Supreme Court further explained that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." 511 U.S. at 842, 114 S.Ct. 1970. A plaintiff need not prove that a prison official had knowledge of the specific assailant's identity, and "it does not matter whether the risk comes from a single source or multiple sources." *Id.* at 843, 114 S.Ct. 1970. Furthermore, as the Seventh Circuit has explained:

[I]f a plaintiff presents evidence showing that a substantial risk of inmate attacks

was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge.

*Mayoral v. Sheahan*, 245 F.3d 934, 938–39 (7th Cir.2001).

However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970; *see also Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir.2002). A reasonable response to a known risk indicates that a prison official was "not indifferent." *Burrell*, 307 F.3d at 8.

Accordingly, to prevail on his claim, Facey must demonstrate that there was a substantial risk of serious harm, that the defendants knew of that harm, and that the defendants nevertheless failed to take reasonable measures to abate that risk. *See Farmer*, 511 U.S. at 844, 114 S.Ct. 1970.

The claims against each defendant must be analyzed individually. "Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's [unconstitutional conduct]." *Calvi v. Knox Cnty.*, 470 F.3d 422, 429 (1st Cir.2006).

b. *Analysis*

For present purposes, the defendants do not dispute that Facey faced a "substantial risk of serious harm" when he was assigned to H–1. *See* Defs.' Memo, in Supp. of Mot. for Summ. J. at 17. Therefore, the instant case turns on whether the prison officials were "deliberately indiffer-

ent," meaning whether they "kn[ew] that inmate[ ] face[d] [that] substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847, 114 S.Ct. 1970. The two remaining questions with respect to deliberate indifference are whether the evidence is sufficient for a reasonable juror to find that each defendant (1) knew of the risk of harm to Facey; and (2) if so, did not take reasonable measures to abate it. *Id.* As explained below, the evidence viewed in the light most favorable to the plaintiff would allow a reasonable factfinder to conclude that each defendant was deliberately indifferent.

 The record is sufficient for a reasonable fact finder to conclude that the defendants' knew of the substantial risk Facey faced when being placed in H–1. "[C]ourts may infer 'deliberate indifference to a known hazard' where prison officials fail to protect an inmate who belongs to an identifiable group of prisoners for whom the risk of assault is a serious problem of substantial dimensions, including prisoners targeted by gangs." *Lewis v. Richards,* 107 F.3d 549, 553 (7th Cir.1997) (citing *Langston v. Peters,* 100 F.3d 1235, 1239 (7th Cir.1996)).

Here, the defendants knew Facey attacked a Gangster Disciple leader about ten months earlier, which led to a reported conflict between that inmate and Facey. *See* Mendonsa Dep. 68:9–10; Raymond Aff. ¶ 11. There was also additional information known to the defendants, including that: the prison had an unofficial policy of segregating prisoners by gang affiliation; inmates would not always report conflicts because of concerns about reprisal; following the attack on Inmate L, Facey had been housed on the North side, where the higher concentration of Bloods reduced the risk of retaliation by Gangster Disciples; H–1 was located in the South side, where the prison usually housed Gangster Disciples; and that placing one Blood in an area with many Gangster Disciples would put the Blood at risk of attack. This is sufficient to permit a reasonable jury to find that the defendants were aware of the risk Facey faced in H–1. *Compare Giroux,* 178 F.3d at 30 (reversing grant of summary judgment for defendant officers when plaintiff had previously complained about threats from his assailant and whose "cell feed" should have alerted officer to plaintiff's protective custody), *with Burrell v. Hampshire Cnty.,* 307 F.3d 1, 9 (1st Cir. 2002) (affirming summary judgment for defendants when plaintiff and his assailant were not rival gang members, the plaintiff was capable of defending himself, the assailant had no apparent motive to attack the plaintiff, and that the plaintiff and the assailant had lived peacefully in the same cell block for four months before the attack).

A reasonable fact finder could also conclude that the defendants failed to respond reasonably to this known, substantial risk to Facey. Facey has presented evidence that the defendants did nothing to protect him from this attack even though they could have moved him to a safer area. Again, this includes evidence that he was the lone Blood in H–1 and that there was a general policy of housing the Gangster Disciples on the South side of the prison. There is also evidence that contradicts the defendants' claim that they were compelled to place Facey on the South side because they did not wish to reunite him on the North side with his previous victim, Inmate M, particularly the evidence that Inmate M was still in the SMU, and not on the North side, when Facey was assigned to the South side. In addition, the defendants have taken inconsistent positions regarding the rationale for placing Facey on the South Side and whether unit

H–1 was an orientation unit at the time of the attack. In deciding the motion for summary judgment, questions of credibility must be resolved in the plaintiff's favor. *See* 10A Wright, Miller & Kane, *Federal Practice and Procedure* 2726, at 440 (3d ed.1998). Therefore, a reasonable juror could conclude that "[t]he record discloses no circumstances that constrained [the defendant] from responding reasonably to protect [the plaintiff]: no time pressure, no lack of resources, no competing concerns whatsoever." *Giroux,* 178 F.3d at 33 (1st Cir.1999) (citing *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970).[6]

Neither defendant is entitled to summary judgment. Mendonsa had a largely supervisory role and *respondeat superior* does not apply to constitutional violations. *See Sanchez,* 590 F.3d at 49. However, the record includes sufficient evidence for a reasonable jury to find that Mendonsa is liable based on his own conduct. As described earlier, Mendonsa "more than likely" participated in the decision to place Facey in H–1. Mendonsa Dep. 73:1–4; *see also id.* 41:1–19 (explaining that inmates could leave SMU only with approval of prison officials, including Mendonsa). Moreover, as part of the team that decided whether to release inmates from SMU, Mendonsa spoke with SMU inmates three times a week and had access to inmate conflict sheets. *See* Mendonsa Dep. 58–59. Finally, in his deposition, Mendonsa admitted that he had heard about Facey's August 2009 attack on Inmate L. *See* Mendonsa Dep. 68:9–10. A reasonable jury could infer from this evidence that Mendonsa was aware of Facey's status as a

Blood and his particular conflict with a Gangster Disciple leader. Therefore, a reasonable jury could find that Mendonsa was aware that Facey faced a significant risk of reprisal from the Gangster Disciples and nevertheless approved his placement H–1, rather than in a safer unit.

### 3. *Qualified Immunity*

Finally, the defendants assert that they are entitled to qualified immunity because the plaintiff has not demonstrated that the evidence, viewed in the light most favorable to him, is sufficient to prove a violation of clearly established law. For the reasons stated below, the defendants have not satisfied their burden of showing that the undisputed facts demonstrate that they are protected by qualified immunity.

#### a. *Legal Standard*

■■■■ Qualified immunity prevents suits against federal and state officials for money damages "unless (1) the facts alleged or shown by the plaintiff make out a violation of a constitutional right and (2) such right was clearly established at the time of the defendants' alleged violations." *Feliciano–Hernandez v. Pereira–Castillo,* 663 F.3d 527, 532 (1st Cir.2011) (internal quotations omitted), *cert. denied,* ── U.S. ──, 132 S.Ct. 2742, 183 L.Ed.2d 615 (2012); *see Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). Therefore, "[t]he classic question that a qualified immunity defense poses is whether the allegedly violated federal right was established with sufficient clarity that a reasonable government functionary should have conformed his conduct accordingly." *Camilo–Robles v. Zapata,* 175

**6.** The court recognizes that he defendants have tendered prison records, discussed at greater length in Parts V and VI, *supra,* that bolster their claim that their decision to place Facey in H–1 was reasonable. These records also pertain to the question of what the defendants' knew when they made their housing

decision. However, because of the untimely filing of these documents, the consequent inability of the plaintiff to respond to them, and the lack of other records necessary to put these documents in context discussed previously, they are not being considered now.

F.3d 41, 43 (1st Cir.1999). "Qualified immunity is an affirmative defense, and thus the burden of proof is on defendants [ ]." *DiMarco–Zappa v. Cabanillas,* 238 F.3d 25, 35 (1st Cir.2001) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

██ "[T]he qualified immunity inquiry is a two-part test." *Maldonado,* 568 F.3d at 268–69 (citing *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). First, the court must decide "whether the facts ... shown by the plaintiff make out a violation of a constitutional right." *Id.* at 269. To satisfy this first prong of the qualified immunity inquiry, the plaintiff "must establish that a particular defendant violated the plaintiff's federally protected rights." *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir.1994).

██ The second prong of the qualified immunity analysis requires that the right have been clearly established at the time that it was allegedly violated. *See Feliciano–Hernandez,* 663 F.3d at 532. "A right is clearly established only if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 532 (quoting *Soto–Torres v. Fraticelli,* 654 F.3d 153, 158 (1st Cir.2011)). This second prong of the qualified immunity inquiry has two parts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." *Diaz–Bigio v. Santini,* 652 F.3d 45, 50 (1st Cir.2011). As the First Circuit has explained:

> One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To overcome qualified immunity, the contours of

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.... Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. That is, the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional.

*Maldonado,* 568 F.3d at 269 (internal quotations omitted); *see also Barton v. Clancy,* 632 F.3d 9, 22 (1st Cir.2011).

██ "It is important to emphasize that this inquiry [concerning qualified immunity] 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also Maldonado,* 568 F.3d at 269; *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.,* 654 F.3d 975, 987 (9th Cir.2011), *cert. denied,* ── U.S. ──, 132 S.Ct. 1566, 182 L.Ed.2d 168 (2012). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

### b. *Analysis*

 As explained earlier, the court did not find that the defendants were shielded by qualified immunity when it denied the defendants' motion to dismiss:

> Examining the "particular facts of the case" as alleged against Mendonsa and Raymond, the court also finds that "a reasonable defendant would have understood that his conduct violated the [plaintiff's] constitutional rights." *Maldonado*, 568 F.3d at 266, 269. It was well established at the time of the alleged incident that prison officials violate the Eighth Amendment if they disregard a known, substantial risk to an inmate's health or safety, *see Farmer*, 511 U.S. at 847, 114 S.Ct. 1970; *Cortes–Quinones*, 842 F.2d at 561, and the complaint adequately alleges that Mendonsa and Raymond knowingly disregarded the risk that the plaintiff would face if housed with members of the Gangster Disciples.

*Facey*, 892 F.Supp.2d at 359. The evidence now in the record does not justify granting summary judgment on this issue.

Some courts have found that the qualified immunity analysis and the Eighth Amendment deliberate indifference analysis fold into each other, reasoning that a reasonable officer would know that conduct amounting to deliberate indifference violates the Eighth Amendment. *See, e.g., Beers–Capitol v. Whetzel*, 256 F.3d 120, 142 n. 15 (3d Cir.2001) ("Because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberate indifferent."); *Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir.1984), *rev'd on other grounds*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("A finding of deliberate indifference is inconsistent with a finding of good faith or qualified immunity.

The two findings are mutually exclusive."); *Carroll v. City of Quincy*, 441 F.Supp.2d 215, 223 (D.Mass.2006) (Gorton, J.) ("Conduct that is deliberately indifferent to an excessive risk to [the plaintiff] cannot be objectively reasonable conduct."). However, neither the First Circuit nor the Supreme Court has decided whether qualified immunity poses a discrete question from deliberate indifference.

Assuming, without deciding, that the question of whether a prison official's conduct violates "clearly established law" for purposes of qualified immunity is a question distinct from whether the officer acted with deliberate indifference under the Eighth Amendment, the defendants are not entitled to qualified immunity. Viewing the evidence in the light most favorable to the plaintiff, a reasonable official in the defendants' position would have known that his conduct violated the plaintiff's clearly established Eighth Amendment rights.

As of 2010, when Facey was attacked, it was clearly established that prison officials violate a prisoner's Eighth Amendment rights when they knowingly place him at a substantial risk of attack from other inmates. *See, e.g., Giroux*, 178 F.3d at 33–34 (1st Cir.1999); *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 561 (1st Cir.1988); *Leonardo v. Moran*, 611 F.2d 397, 398–99 (1st Cir.1979); *Lewis*, 107 F.3d at 553 (7th Cir.1997).

Most significantly, in 1994, in *Farmer*, 511 U.S. at 842–44, 114 S.Ct. 1970, the Supreme Court held that prison officials violate the Eighth Amendment when they knowingly place a prisoner in a setting that puts the prisoner at a substantial risk of violent assault from another inmate. In that case, a transgender inmate was raped after being placed in the general population of a federal penitentiary, and sued the prison officials who placed him there. *Id.*

at 830, 114 S.Ct. 1970. The plaintiff alleged that the prison officials who transferred him into the general population knew of the prison's violent environment and history of sexual assaults, and knew that the plaintiff, as a transgender person, was particularly vulnerable to sexual assaults. *Id.* at 831, 114 S.Ct. 1970. In reversing a grant of summary judgment for the defendants, the Court held that "it is enough [to establish a violation of the Eighth Amendment] that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842, 114 S.Ct. 1970. It further explained that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843, 114 S.Ct. 1970.

The evidence in the instant case would permit a reasonable jury to find that the defendants knowingly subjected Facey to a substantial risk of serious harm from an attack by the Gangster Disciples. As discussed earlier, the plaintiff has presented evidence that: the defendants knew that it was dangerous to put Gangster Disciples and Bloods together; it was especially dangerous to put one Blood in a unit with many Gangster Disciples; and that the prison officials had an informal policy of avoiding placing rival gang members together. Plaintiff has also presented evidence that he was the lone Blood in H–1, on the prison's South side; that there was a general policy of housing Gangster Disciples on the South side of the prison; and that the guards knew of his prior attack on a Gangster Disciples leader. This evidence is sufficient to prove the defendants consciously disregarded a serious risk of physical harm to the plaintiff by placing him in H–1.

Like *Farmer*, Facey has presented evidence that would allow a reasonable jury to find that the defendants knowingly placed him at a substantial risk of being attacked by other inmates and that they violated Facey's clearly established Eighth Amendment rights. Therefore, the defendants are not entitled to qualified immunity.

## V. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Plaintiff's Motion to Strike Portions of the Affidavit of Anthony Mendonsa (Docket No. 55) is ALLOWED in part and DENIED in part. The motion is allowed with respect to paragraphs 12, 14, 15, 20, and 31 of the Mendonsa Affidavit, Memo. in Supp. of Defs.' Mot. for Summ. J. Ex. 1 (Docket No. 52–1). The motion is denied with respect to paragraphs 17, 18, 19, 21, and 26 of the Mendonsa Affidavit.

2. Defendants' Motion to Strike Paragraph # 13 of Plaintiff's Counsel's Affidavit in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket No. 64) is ALLOWED.

3. Defendants' Assented–To Motion for Leave to File Late (Docket No. 67) is ALLOWED.

4. Defendants' Motion for Leave to File Unredacted Copies of Inmates' Prison Records Under Seal (Docket No. 72) is ALLOWED. However, these records are not being considered in deciding the defendants' motion for summary judgment.

5. Defendants' Motion for Summary Judgment (Docket No. 51) is DENIED.

6. By October 25, 2014, the parties shall confer and report whether they have reached agreement to settle this case.

7. An Order scheduling any necessary Pretrial Conference and trial shall be issued.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Valentino Facey

Plaintiff

CIVIL ACTION 11–10680

Anthony Mendonsa et al.

Defendant

*PROCEDURAL ORDER*

*RE: FINAL PRETRIAL CONFERENCE/TRIAL*

*Wolf, D. J.*

The above-entitled action is scheduled for a final pre-trial conference on November 25, 2014 at 4:00 p.m. in Courtroom # 10 on the 5 Floor. Each party shall be represented at the pretrial conference by trial counsel. Counsel shall be prepared to commence trial of this action on or after December 15, 2014.

In order to secure the just, speedy and inexpensive determination of this action in accordance with the Civil Justice Reform Act of 1990 and Local Rule 16.5, the parties shall meet prior to this conference to accomplish the following:

(1) to discuss and negotiate settlement of the action;

(2) to draft and sign a stipulation as to all uncontested facts;

(3) to narrow the issues to be tried;

(4) to exhibit to all parties any and all photographs, documents, instruments and other objects any party intends to offer as exhibits at trial;

(5) to give notice to all parties of the names and addresses of witnesses a party intends to call at trial, including the names and qualifications of any expert witnesses.

Counsel shall prepare and file, either jointly or separately, pretrial memoranda and/or trial documents which set forth the following:

(1) a concise summary of the evidence that will be offered by the plaintiff, defendant and other parties with respect to both liability and damages (including special damages, if any);

(2) a statement of facts established by the pleadings, by admissions or by stipulations. Counsel shall stipulate all facts not in genuine dispute;

(3) contested issues of fact;

(4) any jurisdictional questions;

(5) any question raised by pending motions;

(6) issues of law, including evidentiary questions, together with supporting authority;

(7) any requested amendments to the pleadings;

(8) any additional matters to aid in the disposition of the action;

(9) the probable length of trial and whether jury or nonjury;

(10) a list of the names and addresses of witnesses who will testify at trial and the purpose of the testimony, i.e., whether factual, medical, expert, etc.;

(11) a list of the proposed exhibits (photographs, documents, instruments, and all other objects) in order of their introduction to the Court. Those exhibits to be introduced without objection shall be identified by a single sequence of numbers and those items to which a party reserves the right to object shall be identified by a single sequence of

capital letters, regardless of which party is offering the exhibit.

This material shall be filed, no later than November 10, 2014. A party who intends to object to any proposed exhibit or witness shall give written notice to all parties setting forth the basis for the objection and file said notice, in duplicate, with the clerk on or before _____. A party who intends to file any motion in limine shall do so no later than November 10, 2014. Any responses to a motion in limine shall be filed no later than November 21, 2014.

Each party shall file, by December 5, 2014:

(A) In cases to be tried to a jury, a trial brief including:

 (1) any proposed questions for the voir dire examination of the jury;

 (2) requests for instructions to the jury with citation to supporting authority;

 (3) any proposed interrogatories or special verdict form.

(B) In nonjury cases, a trial brief including:

 (1) any proposed findings of fact and requested rulings of law.

If the trial materials required by this Order have been previously filed with the Court, please advise the Court in writing of the filing date and supplement trial documents, as necessary. Immediately upon receipt of this Order, any counsel who realizes that one or more attorneys have not been notified shall forthwith notify the additional attorney(s) in writing as to the entry of this Order and file a copy of the writing with the clerk.

Compliance with this Order is not excused, absent the actual filing of closing papers or the entry of a Settlement Order of Dismissal in a form prescribed by the Court.

PLEASE NOTE: The Court requires twenty-four hour notice of settlement. Any settlement on the eve of trial may result in the imposition of costs, including the costs associated with bringing in jurors unnecessarily.

10/1/2014

Date

By the Court,

/s/ Daniel C. Hohler

Deputy Clerk